Allen D. ADAMS II, et al., Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, et al., Defendants.

No. CIV.A. 02–0945(RCL).

United States District Court, District of Columbia.

Aug. 25, 2004.

David S. Dessen, Dessen, Moses & Sheinoff, Philadelphia, PA, for Plaintiffs.

Andrea Margaret Wong, Andrew Tanner Karron, David P. Gersch, John Daniel Daley, Arnold & Porter, LLP, Washington, DC, for Defendants.

## *MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the court on defendant Pension Benefit Guarantee Corporation's ("PBGC") and defendant Pichin's motions to dismiss plaintiffs' First Amended Complaint. Defendants move to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(6) on grounds that the complaint fails to state a claim upon which relief may be granted. Plaintiffs submitted memoranda in opposition, and the defendants filed replies to plaintiffs' oppositions. Upon consideration of the parties' filings, the relevant law and the facts of this case, this Court finds that the defendants' motions to dismiss should be GRANTED in accordance with this memorandum opinion.

## I. Introduction

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* The plaintiffs, retired airline pilots seek declaratory and injunctive relief based upon the termination of Trans World Airlines's ("TWA") pilot retirement plan ("Pilots' A–Plan"). Specifically, plaintiffs assert that portions of a Comprehensive Settlement Agreement ("CSA") between TWA, the TWA pilots' union, the financier Carl Icahn and various entities associated with Icahn (the "Icahn entities"), including defendant Pichin Corporation, and the PBGC comprise a transaction to evade liability under ERISA. Plaintiffs also assert that both the Pichin Corporation ("Pichin") and the PBGC breached their fiduciary duties owed to the participants and beneficiaries of the plan.

## II. Background

A. The Comprehensive Settlement Agreement

In January 1992, TWA filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the District of Delaware. At the time of the 1992 bankruptcy petition, there were two identified pension plans covering TWA's employees ("the pension plans"). One, the Pilots' A–Plan, covered pilots and the other covered most other TWA employees. Pls.' First Am. Compl. ¶ 30. According to plaintiffs, there were unfunded benefit liabilities for the pension plans in the amount of $1.124 billion at the time of the bankruptcy proceeding. Of this liability, $444,700,000 was attributable to unfunded benefit liabilities for the Pilots' A–Plan. *Id.* ¶ 31. In or around October of 1992, PBGC announced its intention to terminate TWA's pension plans. In order to postpone or prevent termination of the plans, all parties agreed upon the terms of the CSA. The CSA provided, *inter alia,* that:

(1) Icahn would loan TWA $200 million; (2) Pichin would sponsor the pension plans instead of TWA. Thus, Icahn became responsible for making the minimum funding contributions and TWA was released from all liability for the plans; (3) TWA was to issue $300 million in notes to make part of the annual pension plan contributions in compliance with ERISA and provisions of the Internal Revenue Code; (4) PBGC would not terminate the plans except under ERISA § 4042(a)(2), 29 U.S.C. § 1342(a)(2) or at the request of the Icahn sponsor; (5) PBGC would, at Icahn's request, terminate the plans if a *"Significant Event,"* as defined in the CSA, occurred, and (6) that in the event of a Significant Event requiring termination, Icahn's liability to PBGC would be limited to $240 million.

*See Allied Pilots Ass'n v. PBGC,* 334 F.3d 93, 96 (D.C.Cir.2003) (emphasis in original) (quoting *Air Line Pilots Ass'n v. PBGC,* 193 F.Supp.2d 209, 213 (D.D.C.2002)); Plaintiffs' First Amended Complaint ¶¶ 37–47. The bankruptcy court approved the CSA as part of TWA's Chapter 11 reorganization plan on December 30, 1992. *See In re Trans World Airlines, Inc.,* No. 92–115 (Bankr.D.Del. Dec. 30, 1992). With the CSA in effect, the pension plans remained in existence and TWA continued in operation for an additional eight years. During that time, Pichin acted as the sole plan sponsor and contributing sponsor for the purposes of ERISA and the Internal Revenue Code.[1]

The pension plans were ultimately terminated effective January 1, 2001 after PBGC received notice from Pichin that a defined "Significant Event" had occurred.

---

1. *See* Plaintiffs' First Amended Complaint ¶ 58.

The PBGC, after termination of the pension plans, estimated that the Pilots' A–Plan alone was underfunded by approximately $200 million.[2] In accordance with the CSA, Pichin's termination liability under both TWA pension plans consisted of $240 million to be paid in eight annual payments of $30 million.

## B. The First Pilots' Case

Following the termination of the plans, the Air Line Pilots Association, International ("ALPA") and two individual pilots filed suit in this court against PBGC and Pichin. The plaintiffs in that suit claimed that the PBGC had exceeded its statutory authority by terminating the Pilots' A–Plan based on the terms of the CSA, rather than based on ERISA's criteria for involuntary terminations. On cross-motions for summary judgment, the district court held that the neither the termination nor the CSA itself violated ERISA and therefore, actions taken by the PBGC to terminate the Pilots' A–Plan were not unlawful under ERISA.[3]

The pilots appealed the district court's decision under the representation of the Allied Pilots Association ("APA").[4] On appeal, the pilots argued (1) that the PBGC failed to make an administrative determination in 1992 that the TWA pension plans satisfied ERISA's involuntary termination criteria and (2) that even if the PBGC made a proper determination in 1992, it acted arbitrarily and capriciously by failing to make a second such determination in 2001 before formally terminating the plans. *Allied Pilots Ass'n,* 334 F.3d at 97.

The D.C. Circuit affirmed the district court's decision and concluded that the CSA was lawful under ERISA and that the CSA mandated the PBGC's termination of the pension plan upon the occurrence of a Significant Event. In addition, the court held that ERISA authorizes the PBGC to (1) enter into settlement agreements like the one challenged in this case and (2) postpone termination pending the occurrence of a defined event. The court further concluded that PBGC had not acted arbitrarily or capriciously since "the PBGC was obligated to terminate the plans when the Significant Event occurred . . . ." *Id.* at 98.

## B. The Instant Matter

Following the D.C. Circuit's ruling, the plaintiffs commenced this action against Pichin and the PBGC. The plaintiffs' First Amended Complaint asserts three claims for relief: (1) that termination of the Pilots' A–Plan under the CSA was a transaction to evade liability and thus, Pichin and the Icahn entities are in violation of ERISA § 4069, 29 U.S.C. § 1369; (2) that Pichin, as the sole plan sponsor, contributing sponsor, and plan administrator of the TWA Pension Plans, breached its fiduciary duty to the plan participants and beneficiaries by having engaged in a prohibited transaction under ERISA; and (3) that PBGC's failure to demand or to initiate action to recover the full amount of the unfunded benefit liabilities from Pichin and the Icahn entities constitutes a breach of the PBGC's fiduciary duty as a plan trustee.

## III. Legal Standards

A motion to dismiss under Rule 12(b)(6) tests whether the plaintiff has properly stated a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6).

---

2. *Id.* ¶ 69.

3. *See Air Line Pilots Ass'n, Int'l,* 193 F.Supp.2d at 218–19.

4. The APA assumed the ALPA's collective bargaining responsibilities following TWA's acquisition by American Airlines, Inc. in 2001.

The Federal Rules only require that the complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), because the complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

In deciding a 12(b)(6) motion to dismiss the Court will consider the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters which the Court may take judicial notice. *EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C.Cir.1997); *Chandamuri v. Georgetown University,* 274 F.Supp.2d 71, 76–77 (D.D.C.2003). The Court must accept as true all well-pleaded factual allegations and grant plaintiff the benefit of all *reasonable* inferences that can be derived from the alleged facts. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The suit may be dismissed for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

## IV. Analysis

### A.

■ The court will first address the allegation in plaintiffs' complaint that the CSA constitutes a transaction having a principal purpose of evading liability imposed by ERISA § 4062, 29 U.S.C. § 1362 and thereby in violation of ERISA § 4069, 29 U.S.C. § 1369. *See* Amended Compl. ¶ 81. In accordance with their claim,

plaintiffs seek, *inter alia,* (1) a declaratory judgment that the portion of the CSA purporting to relieve Pichin and the Icahn entities from a significant portion of their liability is unlawful under ERISA and therefore void and unenforceable, and (2) an injunction requiring immediate restoration of the Pilots' A–Plan and restitution from Pichin and the Icahn entities of all benefits that were lost by plaintiffs as a result of the alleged unlawful termination of the Pilots' A–Plan in an underfunded status.[5]

Section 10 of the CSA provides, *inter alia,* that upon termination of the pension plans, "the liability under Title IV of ERISA of the Icahn sponsor, and all members of its controlled group, shall be limited, individually and collectively, to an obligation to make eight annual payments of $30 million each to the PBGC," commencing eighteen months after the date on which the pension plans are terminated. Plaintiffs argue that under ERISA § 4062, 29 U.S.C. § 1362, "plan sponsors and the members of their controlled groups are liable, upon plan termination, to pay for the *full* amount of unfunded benefit liabilities, plus interest from the termination date." Pls.' First Am. Compl. ¶ 48 (emphasis in original). Thus, according to plaintiffs, the $240 million cap on Icahn and Pichin's termination liability under both pension plans constituted a "dormant scheme . . . to evade eighty percent (80%) of their 1992 termination liability . . . ." Pls.' Resp. to Pichin's Mot. Dismiss at 21.

Section 1362 provides that, in the case of any termination of a single-employer defined benefit plan under ERISA § 4042, 29 U.S.C. § 1342, the contributing sponsor of the plan or a member of such a contribut-

---

**5.** Plaintiffs define the amount of restitution owed as the difference in the pension benefits plaintiffs are currently receiving from PBGC and the pension benefits they were receiving prior to January 1, 2001. *See* Pls.' Resp. to Def. Pichin's Mot. to Dismiss Pls.' First Am. Compl. at 19 ("Pls.' Resp. to Pichin's Mot. Dismiss").

ing sponsor's controlled group shall incur joint and several liability for the liability to the corporation and the liability to the designated section 1342 trustee. According to plaintiffs' interpretation of section 1362, "[n]either the PBGC nor any other party to the [CSA] had any lawful authority to forgive or to compromise the liability for unfunded benefit liabilities arising from the Pilots' A–Plan ...." Moreover, plaintiffs' central argument is that the CSA's termination liability cap is unlawful under ERISA because PBGC lacks the statutory authority to compromise the amount of Icahn's § 1362 termination liability.

Plaintiffs' arguments fail under the D.C. Circuit's express confirmation that the PBGC has general authority under ERISA § 4067, 29 U.S.C. § 1367 to enter into liability settlements. As aptly stated by the D.C. Circuit:

> The PBGC's general authority to enter into liability settlements comes from ERISA section 4067, which empowers the PBGC "to make arrangements with [plan] sponsors and members of their controlled groups who are or *may become* liable under [the statute] for payment of their liability." As the bankruptcy court found, the PBGC entered into the CSA pursuant to its section 4067 authority. Under the CSA, Icahn agreed to accept the ongoing role of plan sponsor and to contribute funds to shore up the plans; in return, the PBGC agreed to postpone—perhaps indefinitely—its termination of TWA's plans, to cap Icahn's direct liability at $240 million, and to terminate the plans, upon [Icahn's notification that a significant event occurred]. Each of these promises and counter-promises formed an integral part of the overall negotiated settlement, whose purpose was to prevent termination altogether.

*Allied Pilots Ass'n*, 334 F.3d at 98–99 (citations omitted). Plaintiffs assert that the D.C. Circuit's interpretation of section 1367 is not controlling in the case at bar. Specifically, plaintiffs characterize the D.C. Circuit's interpretation as mere dicta, rather than binding precedent.

This court disagrees. The D.C. Circuit could not have been clearer in stating that ERISA's authorization of the CSA was a key element to its decision that the termination of the plans was done lawfully. The opinion begins by stating, "Because we conclude that federal law authorizes the PBGC to enter into settlement agreements like the one challenged in this case, we agree with the district court that the PBGC's termination of TWA's pension plans was permissible." *Allied Pilots Ass'n*, 334 F.3d at 95. This court finds that the D.C. Circuit's interpretation of section 1367 authority was central to the court's ruling and part of its holding in the case. As such, this court finds that the D.C. Circuit's holding is binding precedent and controlling in the case at bar. Having found that the D.C. Circuit's holding that "federal law authorizes the PBGC to enter into settlement agreements like the one challenged in this case," is controlling, plaintiffs' claim that the CSA constitutes a prohibited transaction under section 1369 is foreclosed.

Even if this court did not find that the D.C. Circuit's interpretation of PBGC's statutory authority is binding precedent, plaintiffs' claim that Pichin and the Icahn entities violated section 1369 is without merit. Section 1369(a) provides in relevant part:

> If a *principal purpose of any person in entering into any transaction is to evade liability to* which such person would be subject under this subtitle and the transaction becomes effective within five years before the termination date of

the termination on which such liability would be based, then such person and the members of such person's controlled group (determined as of the termination date) shall be subject to liability under this subtitle in connection with such termination as if such person were a contributing sponsor of the terminated plan as of the termination date.

29 U.S.C. § 1369(a) (emphasis added). Plaintiffs cite the Third Circuit's interpretation in *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1200 (3rd Cir.1993) that the enumerated transactions discussed in section 1369 were not limited to "the types of transactions covered to traditional sales of pension funds to another entity." Plaintiffs rely on *White* to support the plaintiffs' contention that "[s]ection 1369 applies to 'any transaction' whose principal purpose is to avoid § 1362 liability" rather than applying only to unilateral efforts to evade liability. Pls.' Resp. to Pichin's Mot. Dismiss at 20.

■ This court agrees that the clear and unambiguous language in section 1369 applies to persons entering *any transaction* with a *principal purpose of evading liability*. However, this court does not agree that Pichin and the Icahn entities' involvement in the CSA constitute evasion under ERISA. The CSA at issue constitutes a statutorily authorized transaction between TWA, the pilots' union, Icahn and the Icahn entities, including Pichin, and the PBGC to *settle* ERISA liability. It is not by mistake that Congress issued an express grant of settlement authority in ERISA section 4062(b)(3), 29 U.S.C.

§ 1362(b)(3). Section 4062(b)(3) provides that "[t]he corporation and any person liable under this section may agree to *alternative arrangements* for the satisfaction of [section 4062] liability to the corporation ...." 29 U.S.C. § 1362(b)(3) (emphasis added). In addition, the Supreme Court has made clear that Congress "granted the PBGC discretion to arrange reasonable terms for the payment of [ERISA] liability." *See Nachman Corp. v. Pension Ben. Guar. Corp.*, 446 U.S. 359, 367, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980) (interpreting ERISA § 4067, 29 U.S.C. § 1367). Having concluded that the CSA constitutes a statutorily authorized arrangement to settle unfunded liability, this court rejects plaintiffs' claim that the CSA violates section 1369.

### B.

■ The court now addresses the plaintiffs' second claim that Pichin breached its fiduciary duty when it procured the termination of the Pilots' A–Plan. Plaintiffs assert that as plan sponsor, contributing sponsor, and plan administrator Pichin had a fiduciary duty under ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) to act solely in the interest of the participants and beneficiaries of the plan.[6] According to plaintiffs, the CSA appointed Pichin a "trustee" under ERISA § 4042(b), 29 U.S.C. § 1342(b). Pls.' Resp. to Pichin's Mot. Dismiss. at 22–23. Under section 1342(d)(3), a trustee that has been appointed under section 1342(b) is "a fiduciary within the meaning of paragraph (21) of section 1002 of [29 U.S.C.]."[7]

---

**6.** *See* Pls. First Am. Compl. ¶ 92.

**7.** 29 U.S.C. 1002(21)(A) provides in relevant part that:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or

exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary re-

As Pichin correctly points out in its reply, the CSA appointed PBGC as the statutory trustee, not Pichin. Section 12.1 of the CSA provides in relevant part that "upon or as soon as practicable after a Non–Standard Termination, all assets and liabilities of the terminated Pension Plans 'will be transferred and delivered to the *PBGC as a statutory trustee* of the terminated pension plans.'" *See* Pls.' First Am. Compl. ¶ 50 (quoting CSA § 12.1).

■ Even accepting plaintiffs' allegations as true, Pichin's fiduciary duties as an alleged section 1342 trustee do not extend to Pichin's obligations when acting in the capacity of a *settlor*. The Supreme Court has held that "[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries." *Lockheed Corp. v. Spink*, 517 U.S. 882, 890, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). Furthermore, " '[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or *terminate* [a plan].' " *Id.* (emphasis added) (quoting *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995)) (citing *Adams v. Avondale Industries*, 905 F.2d 943, 947 (6th Cir.1990)). "When employers [or other plan sponsors] undertake those actions, they do not act as fiduciaries, but are analogous to the settlors of a trust." *See Lockheed*, 517 U.S. at 890, 116 S.Ct. 1783 (citations omitted) (citing *Curtiss–Wright*, 514 U.S. at 78, 115 S.Ct. 1223 and *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1188 (7th Cir.1994)).

In the case at bar Pichin acted not as a fiduciary but as a settlor when it requested that the PBGC terminate the pension plans. When acting in this fashion, Pichin's decisions are not subject to ERISA's fiduciary provisions and thus, Pichin's procurement of the termination cannot be the basis for a claim of fiduciary breach.

## C.

Finally, the court will address plaintiffs' third claim that the PBGC should be disqualified as the trustee of the Pilots' A–Plan due to the PBGC's conflicting role as both plan trustee and statutory guarantor. Plaintiffs argue that an independent trustee in the PBGC's position would file suit against the PBGC for breaching its fiduciary duty to protect the interest of the plan participants. Yet, the plaintiffs' main grounds for removal is that the PBGC "will not seek to recover from the Icahn entities any termination liability in excess of the payments set forth in the CSA." *See* Pls.' Resp. to Def. Pichin's Mot. Dismiss at 24. Essentially, plaintiffs ask this court to disqualify PBGC as plan trustee for breach of fiduciary duty based upon the PBGC's failure to collect the full amount of unfunded benefits.

■ Having already found the D.C. Circuit's holding that the PBGC was authorized to enter into the CSA as binding precedent, plaintiffs are barred from challenging PBGC's actions taken in compliance with the CSA. Moreover, plaintiffs' claim that an independent trustee should be appointed to resolve the PBGC's conflict of interest should have been raised in the bankruptcy court proceedings and in the *Allied Pilots* litigation.[8] Accordingly,

sponsibility in the administration of such plan.

8. ALPA was a party to TWA's bankruptcy proceedings and the *Air Line Pilots Ass'n* litigation. *See Allied Pilots*, 334 F.3d at 97. Plaintiffs concede that "TWA's Pilots, includ-

ing the plaintiffs and the members of the Plaintiff Class, were represented for collective bargaining purposes by the Air Line Pilots Association, International (ALPA)." *See* Pls.' First Am. Compl. ¶ 23. Courts have recognized that unions are in privity with their membership for the purposes of res judicata.

it is res judicata here.[9]

## V. CONCLUSION

For the reasons stated above, the Court shall GRANT defendants' motions to dismiss. The Plaintiffs' First Amended Complaint shall be dismissed with prejudice.

The Court will issue a separate order consistent with this opinion.

### ORDER

Upon consideration of defendants' motions to dismiss [# 51 and # 52] Plaintiffs' First Amended Complaint, the opposition to the motions, and reply thereto, the applicable law, and for the reasons set forth in the accompanying Memorandum Opinion issued this date, it is hereby

**ORDERED** that defendants' motions to dismiss are **GRANTED**; and it is further

**ORDERED** that Plaintiffs' First Amended Complaint is hereby dismissed with prejudice.

---

See *Monahan v. New York City Dept. of Corrections*, 214 F.3d 275, 285 (2nd Cir.2000) (finding that officers were in privity with the sole and exclusive collective bargaining representative who had brought a prior action challenging the same policy).

9. Plaintiffs cite *Harris v. Secretary, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 345 (D.C.Cir.1997) for the proposition that in order for defendants to raise res judicata, it must first be raised in a responsive pleading. However, the D.C. Circuit has since held that affirmative defenses may be raised in a pre-answer motion as in the case at bar. *See Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C.Cir.1998) (explaining that "[t]he precise holding of *Harris* is that an affirmative defense not raised by answer cannot be raised in dispositive motions that are filed *post-answer*") (emphasis added).